Pages 1 - 46

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

TIBCO SOFTWARE, INC., a          )
Delaware corporation,            )
                                 )
            Plaintiff,            )
                                 )
  VS.                            )      **NO. C 19-01163 MMC**
                                 )
CONNECTICUT GENERAL LIFE         )
INSURANCE COMPANY (CIGNA), a     )
Connecticut corporation ,        )
                                 )
            Defendant.           )
_____)
                                      San Francisco, California
                                      Friday, August 23, 2019

                        <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:
For Plaintiff:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        555 Twin Dolphin Dr. - 5th Floor
                        Redwood Shores, California  94065
                 **BY:  ANDREA PALLIOS ROBERTS, ATTORNEY AT LAW**

For Defendant:
                        FISH & RICHARDSON PC
                        1717 Main Street - Suite 5000
                        Dallas, Texas  75200
                 **BY:  DAVID B. CONRAD, ATTORNEY AT LAW**

                        FISH & RICHARDSON P.C.
                        500 Arguello Street - Suite 500
                        Redwood City, California  94063
                 **BY:  SARA L. TOWNSEND, ATTORNEY AT LAW**

Also Present:    **Alex Wolinsky, Quinn Emanuel**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

<u>**Friday - August 23, 2019**</u>                                        <u>**9:03 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

    **THE CLERK:**  Calling Civil Case Number 19-1163,
TIBCO Software versus CIGNA.

    Will counsel please step forward and state your
appearances for the record.

    **THE COURT:**  Good morning.

    **MS. ROBERTS:**  Good morning.  Andrea Roberts from Quinn
Emanuel for plaintiff TIBCO Software, and with me is Alex
Wolinsky.

    **THE COURT:**  Thank you.

    **MR. CONRAD:**  Good morning, Your Honor.  David Conrad
on behalf of the defendant CIGNA, and with me is Sara Townsend.

    **THE COURT:**  Okay.  Very good.

    All right.  I have you back here again, and I guess I have
some questions, which is why I wanted you to come in.  I wanted
to clarify, if I could, where the dispute on the plaintiff's
complaint lies and then see where that fits in for a moment
primarily on the technology and also to clarify where things
went awry as at least the complaint alleges.

    What we have here is somebody who has been a customer for
a long time, then they decide they're going to upgrade in some
way, as I understand it, and they contracted with TIBCO to get
some consulting advice I guess on how to set up the new -- I

don't know, what do you want to call it? -- system, equipment, whatever it is, software.

And in the same light, and I don't want to be infringing some copyright, they've got to get authority to use the new system and so they need licenses.  There's a question a little bit of a sort of chicken-and-the-egg thing.  Does TIBCO say, "This is what I think is a great plan," and then CIGNA goes out and gets licenses; or does CIGNA get licenses and then the TIBCO people say, "Okay, this is what will fit in what you've got"?

But leaving that aside for a minute, it's got to match, and to my understanding there's no argument here that the licenses and the software -- the new stuff don't match.  It's a question of how one is going to be charged to pay for it.

And what I'm trying to figure out is where those terms are because I don't understand anyone to be saying that the consultants got CIGNA to install something that they had no right to use but, rather, just that they installed something that somehow CIGNA -- I'm sorry -- TIBCO is charging them too much for.  That's really not, I don't think, the purview or the area for the technicians who go out there.  They're not the money people.

So it seemed to me that that's where the real fight is, whatever contractual terms govern how people are going to be charged.  CIGNA seems to think if they want, I don't know,

1    item A and in order to make item A work, there's some kind of

2    ancillary thing that has to go in, that they oughtn't to be

3    charged for those as two separate things but as kind of a

4    package, and that TIBCO is charging them for two separate

5    copies in effect; and then if you have a limit on how many

6    copies you've got, you get up to the limit twice as fast as you

7    otherwise would.

8         If that's what's going on here -- and maybe somebody can

9    clarify because it's kind of what sounded to me like was going

10   on but it's never been really fully explained, at least to me,

11   because I don't know anything about this general area of

12   technology.

13        So maybe we'll start -- we'll see here.  I'm going to

14   start with Ms. Roberts and just see if she can explain if

15   there's something there that I'm understanding that's not quite

16   right or not enough of what's going on.

17        **MS. ROBERTS:**  Sure.  Do you have a preference as to

18   whether I stand here or at that podium?

19        **THE COURT:**  I can hear you fine.  As long as the court

20   reporter can hear you, it's fine.

21        **MS. ROBERTS:**  Okay.  So from TIBCO's point of view,

22   what's happened here, as Your Honor said, there is a long

23   history of a relationship between the two parties.  It started

24   with the software license agreement in 2001.

25        **THE COURT:**  Let me stop you for just a second.  It has

1 | nothing to do with you.  Just off the record for a minute.

2 | (Discussion held off the record.)

3 | **THE COURT:**  Back on the record.  We have all agreed

4 | that the air conditioning isn't working.

5 | And now, Ms. Roberts, you can continue.

6 | **MS. ROBERTS:**  Okay.  So the relationship dates back to

7 | 2001 with the software license agreement, and there were

8 | several amendments that happened after that; and in those

9 | amendments, additional titles of TIBCO software were licensed

10 | to CIGNA and CIGNA's predecessor in interest before CIGNA

11 | acquired them.

12 | **THE COURT:**  Now, let's just leave the predecessor out

13 | just to uncomplicate that aspect.

14 | **MS. ROBERTS:**  Under the terms of the agreement, there

15 | was an enterprise period; and during that period, CIGNA could

16 | make as many copies as it wanted of the software that was

17 | licensed but at the end of the enterprise period, it had to

18 | provide a deployment report to TIBCO giving the count of "This

19 | is what we have" and the license fees and maintenance fees were

20 | based on that count.

21 | So that's the deployment report.  It's from 2009 is when

22 | that enterprise period ended.

23 | **THE COURT:**  Okay.  And this is the report that your

24 | client says was incorrect or not?

25 | **MS. ROBERTS:**  Correct.  Correct.

```
 1              THE COURT:  Okay.  Yeah, I'm correct that it was

 2   incorrect --

 3              MS. ROBERTS:  Correct.

 4              THE COURT:  -- according to your client.

 5              MS. ROBERTS:  Right.

 6              THE COURT:  Okay.  Okay.

 7              MS. ROBERTS:  So there was an obligation to provide

 8   that report in 2009 when the deployment -- the enterprise

 9   period ended.

10              THE COURT:  Okay.

11              MS. ROBERTS:  And at that time TIBCO did not go in and

12   count.  They took CIGNA's word for it.

13         Subsequently later TIBCO did an audit as it had the right

14   to do under the agreement to check the deployment; and TIBCO

15   had KPMG, an outside independent auditor --

16              THE COURT:  Now, let's not -- they didn't do anything

17   wrong having an audit.  Okay?  Sorry.

18         Okay.  Go ahead.

19              MS. ROBERTS:  And so KPMG in the audit discovered that

20   the numbers, their count, their analysis, they go through the

21   contracts to figure out how to count the number of processors

22   that have the software running on it, and they conclude that it

23   is higher than what the deployment report provided was.

24              THE COURT:  Right.

25              MS. ROBERTS:  And since the fees were based on what
```

```
 1   that deployment report was, that meant that CIGNA was
 2   overdeployed.
 3        THE COURT:   Okay.  But I guess there was another step
 4   in there that I omitted, which was this rewriting based on what
 5   the prior usage was; but the prior usage, that's essentially
 6   where things go awry because -- is it because -- or at least
 7   let me ask CIGNA for a second.
 8        It's your idea, as I understand it, Mr. Conrad, that
 9   you're getting charged or counted, essentially double-counted
10   in effect; or if not double-counted, you're getting counted for
11   things that you shouldn't be counted for; that there was
12   nothing wrong with the way your client counted it, therefore,
13   you didn't use too many down the road because that interim
14   count was correct, et cetera.
15        Okay.  But is it because -- do you agree or not,
16   Ms. Roberts, that -- or I don't know if you've been able to
17   figure this out -- that what happened was KPMG counted what
18   I'll call these ancillary -- I don't know.  What are they?
19   What do you want to call them, Mr. Conrad?
20        MR. CONRAD:   So there was three different things that
21   KPMG did differently --
22        THE COURT:   Okay.
23        MR. CONRAD:   -- than what the parties had understood
24   or what the contracts had specified for.
25        The biggest one I think is that they counted something
```

called virtual CPUs, vCPUs, and that's a technological feature
of modern systems that instead of -- think of a -- think of a
processor chip that runs the computer as a brain.  So inside
this package is a brain.

Well, for a while now these brains have actually been
multiple brains.  So you've got one computing chip package and
inside that you have, say, four brains or eight brains or
twelve brains.  So that's called -- each of those is called a
core.  So one CPU -- physical CPU chip may actually contain
four or eight or twelve different what are called cores.

**THE COURT:**  And those get charged.

**MR. CONRAD:**  And so under the parties' contract and
agreement, counting those is part of how you determine the
number of licenses that you're entitled to.

**THE COURT:**  Okay.

**MR. CONRAD:**  Well, when it came time for us to build
our system, we said, "Well, mono computing is a little
different.  There are virtualization features."  And what that
means is that the old idea of taking a physical chip and you
run your software on one physical chip and that's the only
place it is no matter how many different brains or cores are
inside of it, that's the old way of doing things.

And the new way of doing things is let's have a lot of
different chips; and by using some special software called
virtualization software you could say, "I want one copy of my

1    software to run on one brain on one of these many different

2    chips."  And so in reality you're only using one of those cores

3    instead of all of the cores.

4        And virtualization takes it one step further where there

5    could be something called hyper-threading, and that takes each

6    of those brains and splits it into two, even more.  So in

7    reality you've got one core, one software that's running on

8    just that one core, and the software says, "Well, let's pretend

9    it's two."  And that's called a virtual CPU.

10        So what we did was deploy our software the way TIBCO told

11   us to pursuant to the consulting agreement, and we said, "Okay.

12   We are allowed to say our software runs on this many cores and

13   that's how we can deploy it."

14        And what happened when the audit came around was that it

15   wasn't performed fairly and --

16        **THE COURT:**  Okay.  I don't want to get into that.  I

17   wasn't looking for an argument, and Ms. Roberts has quietly

18   stood there not necessarily agreeing with you on everything.

19        So I'm just trying to get, you know, the technology down.

20   I'm not trying to figure out who's right or wrong in how it was

21   counted because, frankly, that's going to be an issue that

22   isn't covered at least by anything I could read that you gave

23   me.

24        And I want to also indicate that the initial license that

25   we were dealing with -- I don't know -- the SLA or whatever you

1    want to call it, that license I got in such tiny, tiny, tiny

2    print, even with a magnifying glass, because the quality of the

3    print wasn't that good, when you blow it up, you get blurry

4    bigger print and you can kind of read part of it; but if

5    something's buried in there, it was pretty hard to find.

6        The plaintiff is relying on the language about the audit.

7    That's fairly legible; but if there's anything else hidden in

8    there, I'm not sure.  So I want to go back to see if I

9    understand.

10        The old days there was, like, an actual chip and on that

11   chip were core -- you're calling them core -- core what?  Is

12   "core" an adjective or is it a noun?

13            MR. CONRAD:  "Core" is a thing.

14            THE COURT:  Okay.  It's a noun.

15            MS. ROBERTS:  It's a noun.

16            THE COURT:  Thank you.

17            MR. CONRAD:  It's a noun.

18            THE COURT:  Okay.

19            MR. CONRAD:  Think of the chip as a brain.  A core is

20   when you've got a chip with multiple brains in it, not just

21   one.

22            THE COURT:  Okay.  Well, I don't know if I'd think of

23   it that way but, okay, fine, if that's how people do it.

24        Anyway, it's got a bunch -- these cores are -- each one is

25   a unit that gets counted; right?

1          MR. CONRAD:  Yes.

2          THE COURT:  Okay.  So everybody was in accord with

3     that; and if KPMG had come in, they would have counted up those

4     little mini brains, cores, originally and that's what they

5     would have counted but they weren't there then.  They came

6     later?  They came after the new system was in?  Yes?  No?

7          MR. CONRAD:  Yes.  They came in in 2017.

8          THE COURT:  Fine.  Okay.  So the old system is out.

9     The new system is in.  Now we have virtual -- you're calling it

10    virtual CPUs.

11         MR. CONRAD:  vCPU, yes, Your Honor.

12         THE COURT:  All right.  And that is, like -- was that

13    the virtual chip or no --

14         MR. CONRAD:  If you pretend that each of those --

15         THE COURT:  -- because CPU is a computer?

16         MR. CONRAD:  I'm sorry, Your Honor.

17    If you pretend that each of those cores is actually in

18    reality two, it's sort of pretending that one core is now two,

19    two processors, but it's not really a processor.

20    So what you've in effect done is when KPMG came in --

21         THE COURT:  Well, no, I don't want to hear what they

22    did.

23         MR. CONRAD:  Okay.

24         THE COURT:  I want to hear what's going on.  We'll go

25    back later to what -- it's pretty clear what they did.  They

 1   counted things you say they shouldn't count.  I mean, I get

 2   that part.  What I'm just trying to see is these doubled

 3   things.

 4        Why -- in other words, if previously there was just one

 5   core and it gets counted as a unit and now you've got a core,

 6   it's not part of that chip, it's wherever it is, but there's

 7   another one that goes along with it or not?

 8        MR. CONRAD:  The way computers work is they can

 9   pretend to be anything in a way.  That's -- they can -- they

10   can pretend that a core is actually two cores even though it's

11   really only one, and that's what they're doing.

12        THE COURT:  All right.  Did you get charged for two

13   cores?

14        MR. CONRAD:  So KPMG counted each core as two.

15        THE COURT:  Yes or no?

16        MR. CONRAD:  Yes.

17        THE COURT:  Now, isn't that an easy question?  Did

18   they count two as one?

19        MR. CONRAD:  KPMG counted two as one.

20        THE COURT:  Thank you.

21        MR. CONRAD:  Yes.

22        THE COURT:  And are you arguing they should have

23   counted -- no.  They counted two as one or two as two?

24        MR. CONRAD:  I'm sorry.  They counted one core as two

25   cores.

1          **THE COURT:**  Well, there was the second core that went

2     along with it in some way that you say is packaged up with it

3     in some fashion -- right? -- and should just be kind of one

4     package deal and not two separate units.

5          **MR. CONRAD:**  No, I think it's even simpler than that,

6     Your Honor.  It's simply -- if we're talking about just the

7     cores, for each of the cores they counted two, not one, and

8     that's one of the ways they went wrong.  Each core --

9          **THE COURT:**  They counted each single core as two

10    cores?

11         **MR. CONRAD:**  Yes, Your Honor.  When it boils down to

12    it, that's what they did.

13         **THE COURT:**  What did that new core look like that was

14    different from what the old core looked like?

15         **MR. CONRAD:**  The software pretended that it was making

16    two processors.

17         **THE COURT:**  And do you know why that was necessary to

18    make the system work?

19         **MR. CONRAD:**  It's a common practice that's been done

20    for many years now.  It's called hyper-threading and it's just

21    a feature of modern processors that are allowed to turn one

22    core into two virtual CPUs; and according to the --

23         **THE COURT:**  Are they both usable?

24         **MR. CONRAD:**  They're both usable but it's not a speed

25    improvement of two.  So it's not like you're getting double the

```
 1   performance.  It's simply a way for the software to think.
 2          THE COURT:  Maybe you should have gotten charged one
 3   and a half.
 4          MR. CONRAD:  Well, the parties have a formula that
 5   took into account some of those considerations.
 6          THE COURT:  All right.  Okay.
 7      Well, all right.  Is that the only place that this extra
 8   counting, then, went on as far as you understand it?
 9          MR. CONRAD:  So that's a substantial part of it.
10          THE COURT:  Okay.
11          MR. CONRAD:  There are other -- there are two other
12   ways in which we found that they didn't count properly.
13          THE COURT:  Or at least differently than you
14   understood they should?
15          MR. CONRAD:  That's right.
16          THE COURT:  Okay.
17          MR. CONRAD:  And those two ways, one of them is that
18   when we paid a consultant to design an architecture for us
19   consistent with our licensing, what they came up with was a way
20   where installations of some of the administrative software had
21   to be installed on certain computers, and they weren't used but
22   their software wouldn't work unless they put those copies
23   there.
24          THE COURT:  Did they just sit there?  You didn't have
25   to make copies or --
```

1          **MR. CONRAD:**  They installed them and they sat there

2     and they were never used as an actual instance of the software

3     by any party.  It was just simply there to make the software

4     that we did know and want to be installed function.

5          **THE COURT:**  How much -- how often or how many extra

6     times did that sort of dormant thing get counted?

7          **MR. CONRAD:**  I don't have the number, but it was

8     something that it was apparent in the audit that KPMG counted

9     but we didn't believe it should be counted.

10         **THE COURT:**  No, I understand, but is there, like --

11    are there 10 of those?  A hundred of those?  Do you have any

12    idea?

13         **MR. CONRAD:**  I believe it's less than -- when you

14    consider the doubling of the virtual CPU issue, I believe it's

15    less than that.  I just don't have the number.

16         **THE COURT:**  Do you know how much they said you were

17    over?

18         **MR. CONRAD:**  In the audit total?

19         **THE COURT:**  Yes.

20         **MR. CONRAD:**  I think that they wanted $60 million,

21    Your Honor.

22         **THE COURT:**  Well, no.  I'm sorry.  Not how much it

23    turned out in dollars, but just how many -- you know, what was

24    the differential between what you counted just in numbers, how

25    many units, or whatever you want to call it, and what they

1    thought should be counted?

2           **MR. CONRAD:**  Sure.  And this is not an exact number,

3    but this is just --

4           **THE COURT:**  Ballpark.

5           **MR. CONRAD:**  -- a ballpark example.  Let's say we paid

6    for 80 licensed units, so we would have counted the number of

7    cores that each unit was -- each was installed on.

8           **THE COURT:**  No, no.  But you say 80; they say what?

9           **MR. CONRAD:**  They say, let's say, 140.

10          **THE COURT:**  2,000?  150?  What do they say?

11          **MR. CONRAD:**  So 80 is the entitlement and KPMG would

12   have counted, say, 140 in some instances.

13          **THE COURT:**  Okay.  So a little less than double.  All

14   right.  And so that's probably a lot of this what you're saying

15   is that double-counting at the beginning, maybe a few of these

16   extra things that you just talked about, and then what was the

17   last thing?

18          **MR. CONRAD:**  The third is that TIBCO bundled some

19   software together.  So we licensed software, and the way they

20   gave it to us, it was bundled with another product.  And so we

21   never used that product, but there's nothing we can do to -- we

22   can't install the product that we wanted to pay for without

23   installing the product that's bundled with it.

24          **THE COURT:**  Well, is there an upfront charge just to

25   get all this stuff installed that would cover whatever might be

1  that kind of bundled item that you could have used, right, but

2  didn't want or didn't need?

3          **MR. CONRAD:**  Well, since we paid for the license for

4  the product we did want and there's no way to get that product

5  in any other form other than it being bundled, it was apparent

6  to us that we were -- we didn't need another license for the

7  product we didn't use.

8          **THE COURT:**  That's probably an exception to antitrust.

9  Anyway, okay.

10     Now, going back.  All right.  So this is pretty expensive

11 stuff if you're talking about a $60 million differential.

12 That's a lot of money.

13         **MR. CONRAD:**  Yes.

14         **THE COURT:**  In the same light, you also paid quite a

15 bit.

16         **MR. CONRAD:**  Not nearly that much, Your Honor.

17         **THE COURT:**  No, but how much did you think your client

18 should have paid?

19         **MR. CONRAD:**  I don't have the exact total numbers, but

20 let me give you one example.

21         **THE COURT:**  Round.

22         **MR. CONRAD:**  In one instance, one purchase, we spent

23 about a million dollars, and then annually it was on the order

24 of a couple hundred thousand or something like that.

25         **THE COURT:**  Well, it doesn't come up to 60 million.

1        **MR. CONRAD:**  Not over the course of the 10 years that

2    we're discussing here.

3        **THE COURT:**  I mean, this is a large difference that's

4    being disputed.

5        Okay.  As far as this technological, I don't know,

6    tutorial, which I've partly absorbed, Ms. Roberts, is there

7    anything that you would differ with as described -- not who's

8    right, wrong, and anything like that, but just, you know, how

9    things got counted or what they are?

10       **MS. ROBERTS:**  So I don't think so.  I understand what

11   Mr. Conrad just explained to you is their view, their

12   explanation as to why the counts are off; and so, you know --

13       **THE COURT:**  We can leave that out for a second, but is

14   he describing the differences at least in the technology

15   between the old system and the new system in a way that you

16   would agree is pretty close?

17       **MS. ROBERTS:**  I mean, again, my understanding is based

18   on what CIGNA has told us as to why the numbers are wrong.  I

19   mean, KPMG is the one that went in and analyzed and did the

20   counting.

21       **THE COURT:**  Okay.

22       **MS. ROBERTS:**  And so what we've been told by CIGNA is

23   the reason for the difference are these explanations of the

24   technology that Mr. Conrad has provided.

25       **THE COURT:**  Okay.  How did KPMG -- what did KPMG look

1    at, then, to guide them in how you calculate copies?  In other

2    words, these are accountants.  You know, they're not computer

3    people.  Did they look at contracts?  What was it that they --

4    they had to look at something in order to have some idea.

5         **MS. ROBERTS:**  They were given -- my understanding is

6    they were given the contracts and, as you know, there's the

7    original SLA and then the amendments.  So they reviewed the

8    agreements to get an understanding of what the agreements say

9    as to how to count --

10        **THE COURT:**  Right.

11        **MS. ROBERTS:**  -- and then they implemented that.

12        **THE COURT:**  Okay.  So let's say they're looking at

13   whatever your client is relying on and saying, "This is how we

14   read it.  We're accountants."

15        Okay.  And maybe they had questions and maybe your client

16   told them how your client read it.  I don't know.  In the

17   meantime, if they had handed those contracts to, let's say,

18   somebody at CIGNA, CIGNA would have looked at it and said,

19   "Okay.  This is how you count it.  You don't count it this

20   other way.  You count it this way.  That's how we're reading

21   it."

22        So that's really where this difference of agreement or,

23   you know, difference of opinion lies.  And what I didn't see is

24   that -- the original contract, of course, is the old system and

25   it doesn't really cover whatever's going on now.

1    So when the new stuff went in, I don't know if anybody who

2    was in whatever office negotiates these licenses was fully

3    aware of how this might play out later or not.  So I don't know

4    if they're just words that could be read in two different ways

5    in whatever the license.

6        It must be in one of the amendments.  And, in fact, in the

7    complaint itself, I think paragraphs 18 and 19 -- I want to go

8    back and double-check them, but I'm pretty sure it's 18 and 19

9    that says that Amendment 5 and then 6 and 7 kind of just

10   parroted 5 apparently; 5 says how you count processors.

11       Are processors what we're talking about here or is that

12   something else entirely?

13       **MS. ROBERTS:**  So in the agreements there's a

14   definition of "processor" for purposes of counting, which has

15   been -- and once you get that count, that's how you determine

16   the fees.

17       **THE COURT:**  Okay.  So let's say -- all right.

18   So let's go -- for a minute, let's go to your complaint.

19   Okay.  Just hang on a minute and let me read you where I am

20   trying to figure out where this might be hidden.

21       Okay.  Paragraph 18, quote (reading):

22       "Amendment No. 5 included terms for how to count

23       'processors' on which TIBCO software was licensed to run

24       for the purpose of calculating licensing fees owed."

25       And then it says Amendment 6 included the same terms and

so did 7.  That's in 19.

Okay.  I don't have Amendment 5, 6, or 7.  As far as I know, I've got 2.  All right?  I don't care about 2; 2 doesn't tell me anything about this.

So eventually we're going to get to the point where we get to the counterclaims -- all right? -- and at that point you say the following:  "You haven't said that we breached anything. You said that we're supposed to consult and we consulted, and you admit we consulted, and so we'll all sit down and go home."

Mr. Conrad says, "No, no, no, no.  That's not all we're saying.  We're saying that you didn't put in or tell us to get what's covered by our licenses."

And I say to him, "What terms in the license did TIBCO, by not setting this up the way you think they should have, fail to match up properly?"

Okay.  And, of course, what do I have?  No licenses.  So it seems to me that's where the problem is.

Now, I don't know if he can plead a discrepancy actually between the license and whatever the tech people did when they set this thing up or whether it's more just a fight over how you interpret the licenses, which is essentially a defense to your claim, which is also what you're arguing, but at some point it can be resolved hopefully.  It may depend on all manner of ancillary facts about how people did things earlier, what some word in an agreement has been interpreted to mean in

1    the past, whether it was negotiated differently, who talked

2    about it.

3         I have no way of knowing.  All I know is there's a

4    contract dispute here, and I don't think I've got the contract

5    that really covers it in front of me.  So that's where I

6    thought I'll have you in.

7         Okay.  All right.  So do you have somewhere in the stacks

8    of papers you've got on this case the amendment that may be the

9    appropriate one?

10        **MS. ROBERTS:**  I do not have a hard copy with me, but

11   we could certainly submit one later today.

12        **THE COURT:**  You know, I don't really want it now after

13   we've gotten this far.  I can tell you that in all likelihood

14   I'm going to grant the motion with leave to amend and give them

15   a chance to clarify some of the things that they're alleging

16   here because at the moment I don't think that we have enough to

17   know whether there's a separate claim or, frankly, just a

18   defense to what you're asserting; in other words, "You didn't,

19   you know, count enough," "Yes, we did," as opposed to "You

20   breached the contract because you counted it wrong."  Well,

21   it's not quite working out because we've got a damages problem

22   here.  We'll talk about that later.

23        Okay.  So I think I'm missing what I need.  That's all I

24   can say at the moment.  If you want to chime in on this,

25   Mr. Conrad, you're welcome to do it.

1          **MR. CONRAD:**  Sure.  I think what you're missing, for

2     example, is that Amendment Number 5, which is one of the

3     amendments that lists the definition of "processor."

4        I don't think the parties --

5          **THE COURT:**  I think that's what I pointed out to you.

6          **MR. CONRAD:**  Right.  I don't think the parties dispute

7     the clause of the definition of "processor" and that's probably

8     why it was not submitted.

9          **THE COURT:**  All right.  Well, processor may not be

10    what you're talking about.  That's why I asked you when I saw

11    the word "processor" here is processor unit, is processor

12    something else.

13       Where is it that you figure out how to count whatever it

14    is they're counting?  What word do you use, then, for what is

15    getting counted?

16         **MS. ROBERTS:**  So I think, Your Honor, where the

17    dispute lies is, as Mr. Conrad said, I think we agree on what

18    the formula was in Amendment Number 5, which is why neither

19    party submitted it thinking it was necessary to resolve this.

20         **THE COURT:**  Okay.  What's a processor?

21         **MS. ROBERTS:**  And the formula includes, it's I believe

22    the number of CPUs times cores and then times .75.  So it's --

23         **THE COURT:**  Well, is processor not -- that's in

24    quotes.  Okay?  Does that have some meaning?  Somebody put the

25    word "processors" in quotes.  In other words, this isn't a

lawyer term.  It's a term that was arguably in the amendment or
in the contract somewhere.  What is a processor?

    **MS. ROBERTS:**  Well, for purposes of this relationship
in counting, a processor is, as it's defined, this calculation.
And I think where the parties' dispute is --

    **THE COURT:**  Wait.  Wait.  Wait.  In other words,
somebody is counting -- was KPMG sent in to count,
quote/unquote, "copies" or, quote/unquote, "processors,"
quote/unquote, "units"?  What was the word that was sort of
plugged into that directive?  "Count blank," what word goes in
there?

    **MS. ROBERTS:**  I believe they're counting the number of
copies and in order to count the number of copies, they need to
determine the number of processors running the software.

    **THE COURT:**  Okay.  You count the number of processors
and then do you sit down?  Is there something else that you
have to count?

    **MS. ROBERTS:**  Well, to count the number of processors,
you have to count the number of cores and the number of CPUs,
and so I think it's the inputs into the calculation to
determine the number of processors where CIGNA disagrees.  I
think, as far as I understand their position, they would count
the number of cores differently.  I may be misstating his
position, but that's my understanding.

    **THE COURT:**  All right.  So, then, it's the word

"processors" that is in dispute to the extent of what comprises
a processor.  In other words, if the processor is the counted
unit and your client thinks processor is made up of multiple
things and they think a processor is made up of one combined
thing, then that's where the dispute lies.

Now, that term "processor" -- and I don't know if this is
the case.  I don't have any of this stuff.  I'm just, you know,
kind of extrapolating.

Okay.  So if that's where the problem is, in other words,
what makes up a processor, a unit, a copy, whatever that word
was -- let's say it's processor -- yeah, we all agree that you
can make -- you say you made -- let's do it this way because
it's a little different.  You didn't have a contract that said
"You could make X."  You start out with "Make as many as you
want.  Tell us how many you made.  Then we're going to figure
out how we're going to charge you," or whatever.

Okay.  So you could have had a contract that says "Make
100 processors," and they make what they think is 100 and you
think it's 200.  Okay?  And then you could have fought over it
right then.  But it didn't go that way because you had this
kind of middle step where they're just supposed to tell you,
and you think they're hiding the ball and they think you're
counting it wrong -- okay? -- and that's how this all happened.

And maybe the idea that -- I'm not sure why they said they
were going to go somewhere else but, anyway, maybe that caused

you to say, "Gee, you're going somewhere else is the end of it.
We better make sure you're all doing it right," or whatever.
That doesn't matter.

Okay.  So all right.  Your whole fight may be what makes
up a processor.  That is not defined, as I understand it, in
any of the documents that are written in connection with this
relationship.

All right.  In other words, it doesn't say "You can make
100 processors as defined as follows," you know, or
definitional section "By 'processor' we mean..."  And sometimes
contracts, as you know, have whole sections on definitions.
Yours may not.  It may be because everything was fine and
everybody knew what was going on before.

Let me ask you.  Is "processor" the term that they used
under the old licenses?

**MS. ROBERTS:**  Right.  That's the term that's been used
throughout.

**THE COURT:**  Okay.  All right.  So here's the problem.
All right?  All right.  They have an old license.  Everybody
knows what "processor" is because you can pick it up and look
at it in your hand.

Okay.  Now they have virtual whatevers, and so then you
can't pick it up and look at it and so it's harder to count and
that's why you're where you are, and they didn't redefine in
some way.

1    Now, if they want to argue "Your people should have

2 understood that and done something differently" or you want to

3 argue, "No, no.  That's not our job.  That's, you know, the

4 money people and that's somewhere else and we know," and then

5 explain why everyone should have understood how it would work.

6    It doesn't look like they ever really understood what each

7 other was quite talking about at the beginning, but that's not

8 necessarily you don't have a contract.  It just may be that one

9 person didn't understand because they weren't being reasonable

10 in not understanding it right.  I just don't have enough

11 information to say at the moment if this is even where the real

12 disagreement is.  It just feels like it is.

13    So, yeah, all right, Mr. Conrad, you're looking pensive.

14    **MR. CONRAD:**  Yes, Your Honor.  I'm just trying -- I'm

15 trying to make sure that I understand exactly what it is that

16 you're saying.

17    **THE COURT:**  Well, what I'm saying is you have a

18 contract for -- I'm not sure.  Once you gave them the count --

19 all right.  You have a contract to give them a count on

20 processors.

21    **MR. CONRAD:**  Uh-huh.

22    **THE COURT:**  Okay.  You say, "You know, we've got 60 or

23 80 -- say we've got 80 processors."  Okay.  And you sit down

24 and they go do whatever they do.  I mean, that's where the

25 dispute first -- it's not later.  Okay.  So it's at that step.

1      You say, "We've got 80 processors.  We know what a

2 processor is.  We've been doing this for years.  We've been

3 working under this term for years.  We don't need a definition

4 of it."  Processor.  Fine.

5      They come in and they say, "It's a new ball game and the

6 processors are counted differently."

7      Now, if you want to say, "No, they can't do it that way.

8 They're stuck with the old way.  That's what we always did

9 historically," or whatever, and they want to say whatever

10 happened between the people talking about all this and

11 negotiating these licenses or however they want to describe it,

12 they can do that, but at the moment it sounds like you're

13 fighting over what is a processor.

14      **MR. CONRAD:**  Let me -- may I, Your Honor, walk through

15 something a little quick?  I want to make sure we're on the

16 same page with how we view the facts.  Is that okay?

17      **THE COURT:**  Sure.

18      **MR. CONRAD:**  So talking about the old way and the new

19 way, what happened in 2010-2011 was we bought a bunch of rights

20 to their software, a bunch of licensed units.  And now we said,

21 "TIBCO, we're going to do this new way," and that's why we

22 brought in the consultants.  We said, "We don't know how to

23 make this work with our licenses that we just paid for."

24      **THE COURT:**  Yeah, no, I understand, and they --

25 nobody's saying that you are infringing the copyright by using

```
 1    things you don't have a license for.  Okay?  What they're
 2    saying is that you could use it until you overdid it.  Okay?
 3        But the point is that it's not like someone who says, "I
 4    need a license that will cover processors, new processors."
 5    Okay.  Or "I need a new processor that is covered by this
 6    license we got."  I don't know who's supposed to get what
 7    first.  All right.  That's not totally clear here from this
 8    agreement on the words.
 9        But it doesn't matter because your dispute is over how you
10    should be charged, and maybe these people who came in and did
11    whatever they did set it up in such a way that it didn't match
12    how you were going to be charged, but it doesn't look like it.
13    I'm just saying that you may not have a beef -- a whole
14    separate beef.  It just may be that you have possibly a good
15    defense to their complaint.  That, I can't say.
16        But whether this -- I don't know who came in and talked to
17    them and what their, you know, degrees are in and what they
18    were supposed to do exactly.  They were supposed to consult
19    about putting something in that matches up, if you want to say
20    it, the licenses you already have.  So they do that, they put
21    it in, and they say, "Okay.  Start counting."  You count.  I go
22    "One, one, one, one," and they're going "Two, two, two, two."
23        Okay.  I don't know.  I don't know what these people ever
24    understood a processor to be in the new world.  They knew
25    together what an old one was.
```

1          All right.  So that's all.

2          Anyway, you're welcome to try to fix up the

3    cross-complaint here, but I don't know if it's going to work.

4    I'm just saying you haven't at the moment pled that it didn't

5    match up because you say "It doesn't match our licenses" and

6    you never put in what part of the license or what license it

7    didn't match up with or anything.  It's just your opinion.

8          That's a conclusion.  You can't come in and say, "You

9    didn't do what you were supposed to."  You have to say, "This

10   is what the contract says you were supposed to do and you did

11   not do it."

12          **MR. CONRAD:**  If I may, Your Honor, we did plead that

13   in our counterclaim.

14          **THE COURT:**  All right.  I disagree.

15          **MR. CONRAD:**  May I point you to what I see?  And if

16   you disagree, it would help us, I believe, to understand what

17   the difference is.

18          **THE COURT:**  Okay.  If you don't understand by now, I

19   don't know how much more I can say, but I'll give it a shot.

20          **MR. CONRAD:**  We did plead in our answer on paragraph

21   18, we concede -- we admitted that there is a provision that

22   defines what the processor unit is.  This is in our first

23   amended answer and counterclaim.

24          **THE COURT:**  All right, let's see.  (reading)

25          "CIGNA admits Amendment 5 included the following

1       provision but the document speaks for itself."

2       Not really.  Okay.  (reading)

3           "... means a central processing unit on which the

4       TIBCO Software is licensed to run and which for purposes

5       of counting processors on multicore chips" -- is that

6       supposed to be a comma? -- "the number of processors is

7       the number of CPUs times the number of cores multiplied by

8       .75."

9       So is -- okay.  That's not, by the way, in your papers;

10  right?  That's just in your answer.

11          MR. CONRAD:  That's in the answer.

12          THE COURT:  It's not even in the counterclaim but,

13  okay.  Anyway, I mean, it may be incorporated by reference

14  along with a bunch of other stuff but it's not something you've

15  argued.

16      So going back to it and looking at it for a moment, then

17  you have the word "multicore."  Is that supposed to be an E and

18  it just doesn't read well?

19          MR. CONRAD:  It is supposed to be an E.  I'm not sure

20  why that reads that way.

21          THE COURT:  Okay.  And that period is probably a

22  comma.  Okay.  (reading)

23          "... which for the purposes of counting processors..."

24      Yeah, well, you're back to a central processing unit is

25  CPU.  I think we're back to discussing what that means, but the

1   point is if you're saying that they did not put in software

2   that matches that?

3        **MR. CONRAD:**  Well, so that says right here what we've

4   been discussing, which is part of this is you count the number

5   of cores, Your Honor.

6        **THE COURT:**  Yeah, well, you're arguing, though, they

7   didn't count it right.  That's different than whoever put in

8   the system didn't put in a system that goes along with your

9   licenses.

10      You've admitted that to get what you want, you need these

11  other things.  Okay?  And so it's not like the tech people came

12  in, consulted with you, and made you put in things you didn't

13  want that were beyond what somehow you interpret "processor" to

14  mean.  I'm just saying that you're going -- you can plead

15  something but you haven't pled it.

16      Let's go back just to what you do say -- okay? -- for a

17  moment here in your breach of contract.  So we can just go

18  here.

19                   (Pause in proceedings.)

20      **THE COURT:**  Okay.

21      **MR. CONRAD:**  Your Honor, if I may direct your

22  attention to paragraph 33 of our counterclaim, first amended

23  counterclaim.

24      **THE COURT:**  Well, I was looking at 39 when you finally

25  get into breach of contract.  Okay.  You want me to look at 33?

1          **MR. CONRAD:**  Yes, Your Honor.

2          **THE COURT:**  It says (reading):

3          "The calculations from the audit did not reflect the

4      methodology of which TIBCO had been aware."

5      That's back to the KPMG.  It's nothing to say about where

6  TIBCO's consultants went awry.  So let's just see here.

7  (reading)

8          "Among other things, KPMG counted v" -- that's that

9      virtual -- "CPUs, not physical processor cores."

10     All right.  That doesn't mean that TIBCO didn't do what

11 they were supposed to do under the contract.  You're just

12 saying now they're trying to charge you for something that they

13 shouldn't be charging you for.  So let's just keep -- (reading)

14         "They counted installations that were unused,"

15     et cetera.

16     All right.  Back to that.

17     So you may be able to plead something, but right now what

18 you have pled as their failure is, quote (reading):

19         "... to describe the TIBCO active matrix AMX

20     environment as part of the process for identifying project

21     requirements in the hardware purchase needs based on the

22     current TIBCO unit-based licensing."

23     And that's a general statement that doesn't go on to say

24 specifically they did not do X, and I have a feeling that

25 you're going to be hard-pressed to make this into a separate

1    breach of contract claim, but you can try.

2        You're going to have to be more specific.  I don't care if

3    you think you're specific enough here.  In the Court's view,

4    you're not.  So you want to spell it out more and see if it

5    works, fine.  I'm going to dismiss it with leave to amend so

6    then you can go from there in whatever way you want.

7        Then you have -- they're not challenging the declaration

8    of noninfringement.

9        Okay.  We then go to Count 3, duty of good faith and fair

10   dealing.  Now, this is always something that's a little bit

11   not -- it's going to be suspect every time you have an express

12   term and then you try and say breach of the covenant on top of

13   it.

14       Usually these have to do with things that are, frankly,

15   someone exercising their discretion in a fair way and not -- in

16   other words, somebody has done something that under the

17   language of the contract they can do, but they're doing it in a

18   way that is so unfair that the other party can't really ever

19   get the benefit of their bargain.

20       I don't know if this is an exact example, but it might be

21   approval of subtenants, for example.  You're just never going

22   to approve the subtenant.

23       All right.  Anyway, here you say, "Well, they shouldn't

24   have done the audit."  They can do an audit.  They have every

25   right to do an audit.  Whether they did it because they're mad

1    at you or they did it because they suspect you or they just

2    felt it was time to do one, it doesn't matter.  They can do

3    one.

4          **MR. CONRAD:**  Your Honor, I agree with you.  That's not

5    what our claim is about.  Our claim is not about --

6          **THE COURT:**  Then what is it?

7          **MR. CONRAD:**  -- that they didn't have the right to do

8    the audit or they chose to do it unfairly.

9          **THE COURT:**  Well, you seem to be saying that.

10         **MR. CONRAD:**  It's the manner in which they did the

11   audit and what they did with the results.

12         **THE COURT:**  Well, then you're just saying that they

13   did it wrong, and now you're back to this whole idea -- this

14   isn't breach of the covenant.  This is that they didn't count

15   right.  That's your whole defense to their claim that you

16   didn't pay enough.  They say you used 100 and whatever, 40 or

17   whatever.  You say, "No, no.  We used 80."  And that's your

18   whole fight.

19        And then you say, "This is how you count.  You guys aren't

20   counting right."  But it's not breach of the covenant of good

21   faith.  It doesn't match with any breach of the covenant of

22   good faith and fair dealing idea I've ever seen.

23         **MR. CONRAD:**  Your Honor --

24         **THE COURT:**  Okay.

25         **MR. CONRAD:**  If I may, Your Honor, the Supreme Court

1    of Colorado, Colorado governs this contract, it says that the

2    covenant of good faith and fair dealing may apply to

3    performance as well as the enforcement.  When applied in the

4    enforcement context -- and that's what we're talking about

5    here -- it bars dishonest conduct, such as raising an imaginary

6    dispute, asserting an interpretation contrary to one's own

7    understanding, or falsification of the facts.  And that's what

8    we've alleged in here.

9          **THE COURT:**  All right.  Let's see where you've alleged

10   this.

11         **MR. CONRAD:**  We allege that they know how to count and

12   they told KPMG to do something different.

13         **THE COURT:**  Now just one second.

14      All right.  Now, you're reading from?

15         **MR. CONRAD:**  So this is a case *Bayou Land v. Talley*,

16   which we cite in our response to our motion.

17         **THE COURT:**  Just one moment.  Just one moment.  Let's

18   see here where we are.

19                       (Pause in proceedings.)

20         **THE COURT:**  Okay.  One minute.

21                       (Pause in proceedings.)

22         **THE COURT:**  All right.  Sorry.  Let me go to your

23   opposition.

24      Let's see here what we're doing...  You say this is *Bayou*

25   *Land*?

1          MR. CONRAD:  That's right, on page 4 of our response.

2          THE COURT:  Okay.  All right.  I'm just looking.

3    Okay, let's see.

4          MR. CONRAD:  Page 4 and 5.

5          THE COURT:  Uh-huh.

6                    (Pause in proceedings.)

7          THE COURT:  All right.  So let's say this word

8    "once" -- all right? -- "once understanding" means TIBCO's, not

9    CIGNA's.  It doesn't mean raising an interpretation different

10   than the other party is raising.  It means in bad faith you

11   really know that it's X and you're arguing -- in other words,

12   you're saying, "All right, TIBCO, you really know it's X and

13   you're arguing Y."  You have no facts to show that.

14         MR. CONRAD:  That --

15         THE COURT:  You can't just assert "You're lying."

16         MR. CONRAD:  If I may, Your Honor.

17         THE COURT:  Yeah.  Where in it have you pled that --

18         MR. CONRAD:  Yes, Your Honor.

19         THE COURT:  -- facts to support it as opposed to an

20   accusation?

21         MR. CONRAD:  One, we plead that how you count

22   processors is based on the number of cores, and then a series

23   of paragraphs in our counterclaim are discussions that we had

24   with the TIBCO sales rep for CIGNA where --

25         THE COURT:  Okay.  Where's that?

1          **MR. CONRAD:**  So, for example, starting at

2    paragraph 17.

3          **THE COURT:**  Okay.  Let's look at 17 and see what you

4    said.

5          **MR. CONRAD:**  Actually, it's paragraph 14 is where it

6    begins.

7          **THE COURT:**  Okay.  Let's go back to 14.

8                    (Pause in proceedings.)

9          **THE COURT:**  Okay.  If that's what you're trying to

10   say, I don't understand it from that clearly.  In other

11   words -- and you don't hook it up at all.  In other words, what

12   you're doing is coming into court and saying, "Oh, look, look

13   what we said, you know, 20 paragraphs earlier, and that's what

14   we were really relying on here when we got to trying to say

15   what they did wrong."

16      But it's not really put together.  So somebody is reading

17   it and going, "All right.  Historical.  Historical.  And now

18   what are you claiming?"  And now all of a sudden comes this

19   generic remark.

20      So if you want to try and make it more specific and

21   actually plead facts that are understandable to someone who

22   can't tell when you say one particular way of counting

23   something is different than what they're doing, if you are

24   saying that and that it was clear, then you should plead that

25   so that you're saying in effect it was so clear.

1    Now, you know, you have to realize that this could be said

2  in almost every breach of contract case where you say "It was

3  so clear what we meant" -- all right? -- "and that's why we

4  either win because we're suing or they lose because we're

5  defending."  And it's not like it's just so clear that you are

6  actually a fraud in claiming what you're claiming, and that to

7  me is something that is going to be very hard for you to show.

8  It's very much like what we're going to get to in your last

9  claim, which is essentially a promise without intent to perform

10  claim and those are very, very hard to plead, let alone prove.

11    So if you want to -- again, I'm perfectly happy to give

12  you a shot at putting this together better and particularly now

13  that you've explained a little bit more about what's going on

14  here, but it's going to have to be packaged up a little

15  differently.  You can't -- it's fine to list all of the

16  background historically, but then you've got to pull some of

17  the stuff up that you're really relying on at any given point

18  and not just have a kind of "And we're incorporating everything

19  we said before.  You figure out, Judge, what goes together

20  here."  Because that, particularly in this case, I can't do.

21    Okay.  Last one, unfair deceptive trade practices, a

22  little bit like 17200.  It has a little bit more to it.  It has

23  to be some more, oh, I guess, general effect on the public more

24  than might be in 17200; but the idea here that you're saying is

25  that you never intended to do what you promised to do, and that

1    is very, very hard to prove.

2         And when you look at the cases, I mean, people can have a

3    pretty close-in-time even failure and it won't necessarily be

4    enough.  This is remote.  I just don't see that it's going to

5    work for you; but if you want to try, fine.

6         I don't know why you're so, you know, intent on bringing

7    your own claim unless you think you're going to get your

8    attorneys' fees, which you're not because this is not a case

9    where you can claim attorneys' fees.

10        Attorneys' fees, insurance bad faith, malicious

11   prosecution.  You haven't pled a malicious prosecution

12   counterclaim.  Contract that says, "If anybody sues the other

13   person, the winner gets attorneys' fees."  That's not in here.

14   Just a contract that says, "If we have a dispute, attorneys'

15   fees are recoverable."  A statute that says attorneys' fees are

16   recoverable.  All you're saying is "If we win, we ought to get

17   our attorneys' fees."  And they say, "Yay.  We're in America,

18   not England."  What do you have to say about it?

19             **MR. CONRAD:**  Well, Your Honor, think about this.

20             **THE COURT:**  I did.

21             **MR. CONRAD:**  I'm going to give you an analogy.  I

22   think this is going to fit so bear with me.

23        But let's say you wanted to build a house and you go to

24   Home Depot and you buy a bunch of supplies, and you talk to

25   Home Depot and you say, "Home Depot, I need a bunch of

1   supplies.  What do I need?"  And you buy all the supplies.

2       And then you look at it and you're like, "Well, I don't

3   know how to design a house to work with all these supplies."

4   So you go back to Home Depot and you say, "I will pay you

5   money, Home Depot, to build my house.  I just want to use these

6   supplies to build my house."

7            **THE COURT:**  Get your money back if that's your

8   damages.  In other words --

9            **MR. CONRAD:**  Well, the whole point --

10           **THE COURT:**  -- if they gave you bad advice, breach the

11  contract because you were supposed to get good advice, you got

12  bad advice, so if that's your claim, then get your money back

13  that you paid them for the bad advice.

14           **MR. CONRAD:**  The whole point of the contract,

15  Your Honor, was to not get sued.  That's the whole point.

16           **THE COURT:**  No, no, no.  I mean, the whole point of

17  the contract was to get something that worked.  All right?

18           **MR. CONRAD:**  Your Honor, there's a specific provision

19  in the contract that says that "We want you to tell us how to

20  build this based on the licenses that we bought."

21           **THE COURT:**  Right, and they did.

22           **MR. CONRAD:**  The whole point was so that we wouldn't

23  get sued.

24           **THE COURT:**  And they did.  Your whole argument is they

25  built it in accordance with the licenses you got and that, one,

1  TIBCO is misinterpreting those licenses and is doing it so

2  badly that they're obviously acting in bad faith in suing you.

3          **MR. CONRAD:**  Well, it's either/or, Your Honor.  I

4  mean, I agree --

5          **THE COURT:**  We'll see.

6          **MR. CONRAD:**  -- that not all the claims can stand, but

7  it's in the alternative.  If they're right, then we breached

8  the contract.  If they're wrong, then we're okay.  It's in the

9  alternative.

10         **THE COURT:**  I don't know that this is working.  Let me

11  think about it for a second, but I don't think so.

12     Anyway, you haven't claimed -- you haven't tried to get

13  your money back for them doing such a lousy job, which so far

14  you haven't proved they did; but once you maybe plead that,

15  we'll see where that goes.

16     All right.  I see what you're saying -- okay -- that

17  there's this idea that -- well, you still -- I'm sorry, until

18  you plead that first claim adequately, everything really is

19  flowing from that.  In other words, if they didn't do anything

20  wrong that you can show, then there's no way that you can start

21  claiming attorneys' fees for what they did wrong; and I'm not

22  sure you can but at least if you get the underpinnings in some

23  way nailed down, then I would have a better idea if you can

24  spin off it to some of these other things that you're trying to

25  do.

 1        I will say that TIBCO in initially raising any question

 2   about attorneys' fees threw it in sort of in the beginning and

 3   then didn't really argue it.  You came back and argued it.

 4   Then they came back with a big footnote.  I don't know -- you

 5   know, you're not supposed to try and avoid page limits by

 6   having, you know, gigantic footnotes.  But, anyway, they came

 7   back with a footnote.

 8        I don't think the cases that are cited here quite touch

 9   upon what your point is.  They differ and it's one case relying

10   on another.  I have them, *Ferguson*, *Smallwood* case, *Bunnett*,

11   whatever it's called.

12        But I think you've got to work on it and, frankly, I don't

13   know if it's worth it to you.  It may be if there's a real

14   outlay here that your client has suffered.  I don't know about

15   the attorneys' fees, but they're going up so you should be

16   really trying to see what you can do about this just really to

17   get the case moving and decided.  And I have a feeling that

18   it's not going to be clear from the terms of whatever everyone

19   ends up relying on without looking at, you know, other facts

20   that surround whatever went on between the parties.

21        Did your client go to someone else ultimately before you

22   got sued?

23            MR. CONRAD:  What do you mean "someone else"?  As in

24   switch from TIBCO?

25            THE COURT:  You were going to switch, yeah.

1    **MR. CONRAD:**  So we did state our intent.  The way it

2    works is every year we would pay TIBCO money to upgrade it or

3    whatever, and we told TIBCO we're done so we're not going to do

4    that anymore.  And I believe as of now we're not paying them.

5    I'm not quite sure.

6         **THE COURT:**  So what you were telling them is not

7    necessarily you were going to a competitor?

8         **MR. CONRAD:**  We're done.

9         **THE COURT:**  What does that mean?

10        **MR. CONRAD:**  That means we're going to stop paying you

11   maintenance fees because we're going to stop using the

12   software.

13        **THE COURT:**  And then what?  Then you'd have to get

14   someone else's?

15        **MR. CONRAD:**  No.  I believe --

16        **THE COURT:**  They don't need it?

17        **MR. CONRAD:**  I believe it wasn't needed.  I'm not sure

18   it was a simple switch from one to the other.  I believe it was

19   a legacy system that was ultimately going to be shut down.

20        **THE COURT:**  Yeah, well, you might just confer with

21   your client about whether or not there would be any reason to

22   get back to a productive business relationship with TIBCO.  If

23   they don't need each other, that's a different story.  You

24   might at least inquire about it.

25        **MR. CONRAD:**  So, Your Honor, that is a consideration

1   that came up in discussions leading up to the lawsuit.  I

2   believe TIBCO's goal and what they expressed was to try to keep

3   us as a customer, and that was not persuasive.

4          THE COURT:  Hmm.  Well, I'm kind of curious why and

5   Ms. Roberts is looking like "Really?"  I don't know.  I can't

6   exactly read her expression and you're really deadpan.  But

7   anyway.  I would say that, anyway, it's worth taking a look at.

8          I can see this going on for some time and that, as I say,

9   it's hard for me not knowing exactly what all went on before

10  and how the switchover exactly was discussed and all to know if

11  one of you is going to be more likely right or not on this, but

12  I am going to grant the motion.  I'll just say now the motion

13  is granted for the reasons I said with leave to amend.

14         How much time do you need?  Do you want two weeks?  Three

15  weeks?  What do you need to do this?

16         MR. CONRAD:  I think three weeks would be fine, 21

17  days, Your Honor.

18         THE COURT:  All right.  Let's just see where you are

19  and I'll give you a date -- okay? -- so then you can't fight

20  over what that means.

21         All right.  Okay.  So today is the 23rd.  One, two, three.

22  What are we?  September 13th?

23         THE CLERK:  That's right.

24         THE COURT:  Friday the 13th.  If you're not

25  superstitious, then your amended complaint is due by then.

1    Okay.  You caught my attention a little with this business

2  about avoiding litigation idea, but you first have to -- you

3  still need to work on it.

4    **MR. CONRAD:**  I think that's maybe where the disconnect

5  is, Your Honor.  We can flesh this out much more fully with

6  even more facts and connect all the dots, and I think that's

7  where the disconnect is.

8    **THE COURT:**  That may be, but okay.  All right.  That

9  may be the case and you may just know everything so well, you

10  know, because you're familiar with the case, that you think

11  other people would connect things that you've connected that

12  other people might not connect, you know, sort of, or at least

13  this person didn't connect.

14    All right.  So all right, fine.  I don't know if there's

15  anything else we can do.  I think we've sort of done it.

16    I still am sort of hoping that before, particularly if

17  attorneys' fees are recoverable, you know, before your clients

18  bleed too much more, you know, into litigating -- I don't know,

19  they're all real businesses.  You know, I just leave it to you.

20    Okay.  Thank you.  We'll be in recess until 10:30.

21    **MR. CONRAD:**  Thank you.

22    **MS. ROBERTS:**  Thank you, Your Honor.

23    **THE COURT:**  Thank you.

24        (Proceedings adjourned at 10:05 a.m.)

25            ---oOo---

1

2

3                        <u>**CERTIFICATE OF REPORTER**</u>

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, August 29, 2019

8

9

10

11    _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25